LOREN M. LAMBERT, No. 5101
ARROW LEGAL SOLUTIONS GROUP, PC
266 East 7200 South
Midvale, Utah 84047
Telephone: (801) 568-0041
llambert@arrowlegalsolutions.com
Attorney for Complainant

---

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| DANA W. WEBSTER,<br><br>    Plaintiff,<br><br>vs.<br><br>SECRETARY OF VETERAN AFFAIRS ERIC K. SHINSEKI, CHIEF ROBIN KOROGI, CHIEF ALBERT BELL, RONOLD BEARD, DEPARTMENT OF VETERANS AFFAIRS, JOHN DOES and JANE DOES 1-5,<br><br>    Defendants, | COMPLAINT<br><br><br>Case No. 2:13-cv-00095-EJF<br><br>Judge: Furse |

Complainant, through his counsel of record, hereby files his Complaint as set forth.

**<u>VENUE & JURISDICTION</u>**

1. This is a civil action seeking damages for discrimination and retaliatory based Title VII and the Rehabilitation Act.

2. This Court has jurisdiction under 17 U.S.C. § 101 et seq. and 28 U.S.C. § 1331.

3. This Court has personal jurisdiction because the events that give rise to the causes of action herein took place in Salt Lake County, Utah.

## PARTIES

4. Plaintiff brings suit against the agency and all of the individual Defendants named above in their individual and official capacities in so far as it is allowed by current law.

5. Unless specifically noted below, all Defendants participated in concert with each other either directly or through their agents in the actions taken against Plaintiff.

## FACTS

6. Complainant, Police Officer Dana Webster (PO Webster, hereafter) is a highly educated, skilled and competent agent of the veterans administration. At the time of the incidents giving rise to his complaint he had superior academic and professional accomplishments to all other applicants that he competed against for promotions and other positions.

7. On January13, 2002: PO Webster was hired at the Salt Lake City VAMC (SLC

VAMC, hereafter).

8. In 2003: Ryan Zumwalt was hired at the SLC VAMC and was coworker of PO Webster. PO Webster was Zumwalt's Field Training Officer.

9. In the fall 2003: PO Webster filed an OIG & OSC (protected Whistle Blower activity) complaints regarding a patient and child pornography. As will be indicated below, PO Webster contends that the VA, through its agents, Dir. Korogi and Chief Cowley, decided to terminate PO Webster because of this protected activity.

10. From 1978 to 2006 PO Webster was a member of the US Air Force Reserves, and was a Security Forces and Combat Arms Instructor. In 2005 he was deployed to Operation Iraqi Freedom. He was discharged on November 3, 2006 due to a combat related injury and will receive disability and retirement.  (His injuries include respiratory problems and a back injury).

11. On September 2006 SLC VA Chief Bill Cowley had temporarily hired PO Webster's replacement PO Ronald Beard and told him that he was going to terminate PO Webster when PO Webster returned to duty at the SLC VA.

12. October 2006: Prior to leaving active duty, PO Webster filed a Directors Action Line Complaint to contest his intended termination.  PO Webster asserts that immediately after filing this complaint, the VA, through its agents Dir. Korogi, Chief

Cowley, Chief Bell, and to a lesser extent, PO Beard and others, started retaliating against him, as set forth below.

13. November 3, 2006: PO Webster returned from Operation Iraqi Freedom and assumed the responsibilities of a GS-7 Police Officer with the SLC VA. At that time, AFGE Union President Nancy Jones informed PO Webster by phone that he should re-sign or the VA would terminate him. Also, former PO James Stritikus informed PO Webster that he was going to be fired.

14. February 2008: PO Webster filed a complaint with U.S. Department of Labor concerning URERRA Rights for returning servicemen to be returned to his prior position at the SLC VA.

15. October 2003-January 3, 2009: From October 2003 until PO Webster left on January 3, 2010 for a job at the Seattle VA, he believes that he was harassed and retaliated against by management, both because of his age and because of his protected activities. These protected activities consisted of filing a Directors Action Line Complaint and U.S Department of Labor on his URERRA Rights; his disclosures and complaints to the OSC, OIG, Internal Crimes against Children Task Force, the Office of Security and Law Enforcement and to his legislative representatives.  PO Webster attests that he would not have filed his complaints unless there had been a valid basis for them.

-4-

a. This harassment and retaliation, as noted below, generally took the form of extreme and undue scrutiny of his background, his work performance, and his association with other officers. It also took the form of making sure that everyone working at the SLC VA were aware of management's desire to eliminate him.

b. PO Beard testified that the Agency, as stated by the Chiefs Cowley and Bell, viewed PO Webster's protected activities in filing complaints as insubordinate and that "there's got to be a point where [the complaints were] not entertained any more," and that there had, "to be an end to it."

c. In fact, VA director Korogi acknowledges that there was a pattern of inappropriate behavior engaged in by Chief Cowley against PO Webster. As a result, the Agency and PO Webster entered into a settlement in which all of the erroneous and inappropriate disciplinary actions taken against PO Webster were expunged from his record. After this, the only problems brought to Director Korogi's attention regarding PO Webster was PO Webster's protected activities complaint that he had been inappropriately denied training as a firearms instructor and his complaint that he was not selected as a firearms training instructor.

d. PO Beard admitted that he told PO Jordan that he did not like PO Webster because of his protected activities.

e. PO Webster asserts that, in filing his complaints, he did not engage in any behavior that was illegal, insubordinate, or inappropriate. He further denies that he engaged in any behavior that demonstrated any unfitness for duty, and specifically indicates that all allegations made against him by the Agency in support of their motion to dismiss are false. The claims made by the Agency through its witnesses Chief Bell that he has poor interpersonal skills and was allegedly insubordinate are merely code phrases and labels placed on him because he legitimately engaged in protected activities to expose the corrupt, illegal, and inappropriate actions being engaged in by Dir. Korogi, Chief Cowley, Chief Bell, and PO Beard.

f. PO Webster only wanted to be able to do his job and be given a fair opportunity to advance in his career. Despite the Agency's self-serving disparagement of his character, many officers—even those that have provided false and contrary information about him—have noted in their statements and depositions, that he was, "at all times" "highly qualified," "very knowledgeable," diligent, "competent" and "very thorough when he performed his duties."

g. PO Wayne Vouvalis, indicated he got, "along with PO Webster," and, "never had any incidents with PO Webster."

h. PO Beard stated that PO Webster, "was a very good officer . . . he's a great officer," and that, he, "never had any disputes with him . . ." PO Beard further testified that, "PO Webster's technical qualifications were excellent . . . his [promotion] application . . . [had] some . . . very great verification with the Utah state code, education and experience in law enforcement . . . [H]e had great attendance and showed up to work on time."

i. Contrary to officer Beard and the Agency's assertions, PO Webster attests that he was on time for all selection boards for the positions he sought to be promoted on. In regards to the Agency's allegation that PO Webster was late, on the particular promotion board in question, PO arrived on time at the interview location but the door into the board where the interviews were taking place was closed. PO assumed that an interview was taking place and did not at first interrupt. He then knocked on the door and there was no answer. PO Webster then went to the administrative office and knocked on the door. No one answered. He tested the door and it was locked. He then went and spoke with Pres. Nancy Jones of the AFGE. After several phone calls and arrangements the board was reconvened and PO Webster was interviewed. PO Webster sat for interviews because, even though he had been told on several occasions that he would not be selected, he had a good-faith desire to be promoted.

16. February 26, 2009: The Salt Lake City Healthcare System opened Vacancy Announcement Number **D1639-2009** to hire two Lead Police Officers [SGT.] GS-0083-7 or GS-0083-8. This vacancy is the subject of PO Webster's Claim C, Event 1.

17. February 26, 2009: The Salt Lake City Healthcare System opened Vacancy Announcement Number **D1641-2009** for a Supervisory Police Officer GS-0083-8 or GS-0083-9**.**  The original announcement posted in the VA Police Operations Office for Supervisory Police Officer stated the same qualifications were needed as have been set forth in prior announcements under the Qualifications Requirements. One qualification

for the GS-8, was that the applicant must have one year of specialized experience as an instructor including Firearms Instructor. This vacancy is the subject of PO Webster's claim, Claim C, Event 2.

18. At the time of these job announcements, PO Beard was in the position of a Lead Police Officer with rank of Sergeant and did not have the one year of specialized experience as a Firearms Instructor, and therefore did not qualify for the position noted in above. It appears that due to this circumstance, the VA management changed the position announcement to indicate, "For GS-8 you must have one year of specialized experience at the next lower grade." PO Beard in fact applied for the position and was granted it. At the time, he was approximately 32 years of age.

19. February 2009: Albert Bell became the Chief at the SLC VAMC. VA Dir. Robin  Korogi selected him and he officially started on March 1, 2009.  Director Korogi instructed him, "on the status of the police service . . . and prioritize[d] what [she] needed him to do." Korogi also discussed with him during his first two months of employment the personnel issues at the SLC VAMC. Specifically, she told him about the decision from, "the Office of Special Counsel that had . . . found . . . there were improper actions made by the former chief of police, Chief Bill Cowley, against [PO Webster]." She also explained that there were, "a lot of police officers [Dana Webster, Ryan Zumwalt, Tressa

Jordan, Steve Anderson] that were filing complaints or grievances against the former

Police Chief Cowley," and that management needed to determine why the police officers

were not, "sitting down with their supervisors and working things out." Dir. Korogi

specifically testified she informed Chief Bell that there was pending disciplinary action

against PO Webster.

   a. Chief Bell was a retired MSgt. who had been in the Security Forces at Hill
A.F.B and who had worked as an Armed Private Security Officer for TW & Company,
providing Armed Entry Controllers at Hill A.F.B.
   b. Prior to coming to the SLC VA, Chief Bell had worked with PO Beard, Officers
Benincosa, Vouvalis, Gray, Hess, Steffen, Pinchbeck, and Crosbie in the Security Forces
at Hill AFB, or at TW & Company or other private security companies providing contract
security at Hill A.F.B.
   c. Upon duties, PO Beard escorted Bell into the Veterans Affairs Police Operations
Center and introduced him as the new Chief of Police. PO Webster attended this meeting.
Bell claimed that he did not know anyone at the Veterans Affairs Police with the
exception of PO Beard. This was incorrect.
   d. At this meeting, Bell stated that any Police Officer who engaged in protected
activities by filing a complaint outside of his office, with any agency such as the OIG or
OSC, without his knowledge and without going through him first, would be investigated
for insubordination and that the officer would be terminated.
   e. At the meeting, Chief Bell asked PO Webster and others questions about their
ranks, ages, length of service and length of military service.

   20. Around the time that Chief Bell assumed his duties at the SLC VA, he made

statements on numerous occasions to multiple officers that indicated a retaliatory and

discriminatory animus towards PO Webster and others.

   a. PO Beard testified that within 30 to 60 days of Chief Bell taking command,

Chief Bell complained about PO Webster's protected activities and labeled PO Webster's protected activities as, "challenging authority."

b. PO Beard further testified that the only problem that Chief Bell had against PO Webster was his engagement in protected activities, that Chief Bell labeled them as, "interpersonal communication flaws." Otherwise, PO Webster was viewed by Chief Bell as, "a great officer and did his job well."

c. PO Beard further testified that Chief Bell was upset with PO Webster because he asked others to provide testimony regarding Chief Cowley and Chief Bells' inappropriate, illegal, and discriminatory behavior and labeled this protected activity as, "challenging authority, dissension, misconduct, and insubordination."

d. PO Beard testified that Chief Bell was aware of Webster's EEO activity and viewed these protected activities as "personality issues" between PO Webster and the Chiefs.

e. PO Beard testified that PO Webster was not allowed to attend the firearms instructor course nor be a firearms instructor because of his alleged, "interpersonal skills."

f. PO Jordan testified that both Chief Bell and PO Beard did not like PO Webster due to his protected activities in filing complaints. She further overheard officer Beard bragging that he would never promote PO Webster.

g. PO Eugene Montoya indicates that Chief Bell told him that he should not associate with PO Webster because he and others were "bad apples," and that Chief Bell, Capt. Beard and PO Vouvalis told him when positions became available that the Chief did not want PO Webster in any of these positions and therefore they needed other officers to apply.

h. PO Beard testified that Chief Bell said that officers who engaged in protected activities by filing complaints outside the chain of command would not be tolerated there would be held "accountable."

i. PO Beard testified that Chief Bell also indicated that officers who asserted their rights to F.O.B. union representation and legal representation would not be tolerated. This was verified by PO Jordan.

j. Anyone that disagreed with Chief Bell, even when they had justification for their disagreement, were labeled by Chief Bell as being insubordinate. Tammy Ice and Lisa Porter from human resources lamented that Chief Bell would not follow their advice regarding disciplinary actions and therefore complained about them.

k. PO Jordan testified that during Chief Bell's tenure at the SLC VAMC, the

-9-

management culture did not tolerate officers engaging in protected activities by complaining about their superiors.

    l. PO Jordan testified that Chief Bell didn't like PO Webster due to his protected activities.

    m. PO Ronda Harper reports that in March 2009 she knew that Chief Bell and Director Korogi did not like PO Webster and were going to do whatever they could to get rid of him. PO Harper heard Bell on several occasions state that, "he just wanted to get rid of Webster." ~~"He just wanted to get rid of Webster."~~

21. 2008- 2010: Sometime prior to Chief Bell's arrival, Robin Korogi had become the Associate Director and Acting Director of the SLC VAMC. As such, Director Korogi was Chief Bell's supervisor.

22. March 1-8, 2009: Chief Bell called PO Webster to his office. Chief Bell advised Webster that, as the most experienced and qualified officer in the department for Firearms Instructor, Webster would be sent for additional training and would thereafter be selected as the Primary Firearms Instructor for the VA police department.

23. March 2009: Prior to the closing of the Vacancy Announcements noted in ¶23 and ¶24 above, during the night shift, PO Jordan stated, while in presence the VA Police Administration, that she heard that the VA was not going to promote Officer Tudor because he was too old and was going to retire in a couple of years.

    a. PO Jordan warned Webster that, as long as he was at the Salt Lake City VAMC, he would not be promoted. She further warned that any programs PO Webster proposed would not go anywhere because the administration believed that Webster was behind Officer Zumwalt's complaints, including an MSPB Complaint that went to a hearing in

February of 2009 in which Zumwalt prevailed. Jordan advised Webster to seek employment at other VA Medical Facilities where he might get promoted.

24. March 15, 2009: PO Beard was hired for the position of Supervisory Police Officer, as noted above, and was hired from an internal list—meaning that during the selection process among internal applicants no panel or board was convened and no performance-based interviewing was conducted.

a. Chief Bell was the selecting official who promoted PO Beard. At the time he was promoted into this position, Mr. Beard was approximately 32 years of age. PO Beard had two years experience as a veteran's police officer and PO Webster have nine years experience as a veteran's police officer. At that time, PO Webster was 53 years of age and had the qualifications as noted above or in the attached declaration, that Beard did not have.

25. Generally, the following information applied to all boards or panels that were convened to consider PO Webster and others for promotion and apply to promotions during Chief Bell's tenure at the SLC VA:

a. PO Beard testified that Chief Bell appointed all persons who sat on promotion panels that considered PO Webster for promotions.

b. PO Beard further testified that Chief Bell instructed officers who sat on promotional panels that those like PO Webster who had, flawed "interpersonal communication skills" should not be promoted.

c. PO Beard further testified that while Chief Bell was at the Salt Lake VA, Chief Bell appointed officer Beard to sit on approximately 1 to 2 selection panels in which PO Webster was considered for promotion.

d. PO Eddie Fisher indicates that whenever PO Webster applied for promotions or training the Agency would commence a fact-finding investigation against him.

e. PO Zumwalt reports that Chief Bell would coach those that he wanted to be

promoted that applied for promotions to make sure that they were selected. Chief Bell also indicated that he was the one that made the selection on all promotions. Another officer told PO Zumwalt that the Agency and the Chief solicited other officers to apply so they did not have to select PO Webster.

    f. While Chief Bell was at the Salt Lake City VA, he hired approximately 6-7 individuals from Hill Air Force Base.

26. March 16, 2009: Webster received written notification for Vacancy Announcement **D1639-2009**–Lead Police Officer, from Lisa Porter, Human Resource Director that stated, "You were qualified and referred for consideration, but not selected at this time." PO Webster was passed over for position of Lead Police Officer.  This vacancy is the subject of PO Webster's Claim C, Event 1.

27. March 17, 2009: Webster received written notification for Vacancy Announcement # **D1641-2009**, Supervisory Police Officer from Lisa Porter, Human Resources Director that stated: You were qualified and referred but not selected at this time." PO Webster was passed over for position of Supervisory Police Officer. As stated above, PO Beard was promoted instead. This vacancy is the subject of PO Webster's Claim C, Event 1.

28. March 19, 2009: Chief Bell called Officer Ryan Zumwalt over to his office and stated that he knew that Webster had pulled Zumwalt away to discuss the promotions. Bell further stated to Zumwalt that he had been told that Zumwalt was upset with the

promotions.

a. Chief Bell stated that Webster's track record is like a marquee, it is lit up and the whole VA administration knows about it.

29. March 25, 2009: Chief Bell sent PO Beard to instruct PO Jordan to write a statement against PO Webster. She refused. Jordan Depo. 10:3-7. Chief Bell then called PO Jordan to his office. Chief Bell told PO Jordan that PO Webster had filed complaints, and was coming after her, and he wanted her fired. Chief Bell stated that he could not protect PO Jordan unless she wrote a statement against PO Webster. Chief Bell threatened her that if she did not write the statement against PO Webster that she, "would be criminally charged for impeding an investigation. . . ," and, "would be fired. . ."

a. PO Jordan did not want to write a statement, but under Chief Bell's order, she had to. Jordan was not familiar with the Report of Contact procedures or the Fact Finding Investigation process. PO Jordan did not know that Chief Bell could not force her to write a statement. Specifically, PO Jordan testified that chief Bell, "told [her] exactly what he wanted, what he needed in it."

b. PO Jordan indicated that while she was writing the statement in Building T-1, Chief Bell looked over her shoulder and read what she had written. He would tell her what he wanted in the statement in order to emphasize any negative information about PO Webster and to make PO Webster appear to be extremely paranoid or violent.

c. PO Jordan indicated that, "Chief Bell stated that his goal was to get rid of PO Webster and his FOP Attorney. He was angry that the FOP attorney was on VA property and that he would arrest them and have them removed." PO Jordan further indicated that both PO Beard and Chief Bell, with director Korogi, "helping them [. . .] talked openly about their plans and the various ways they could remove," PO Webster and that, "they would never promote him."

d. PO Beard acknowledged that he did ask PO Jordan to write a complaint about

-13-

PO Webster.

30. March 25, 2009: Officer Ryan Zumwalt states that Chief Bell ordered him to make a Report of Contact against PO Webster (a Report of Contact is a an adverse statement regarding an issue or an officer). When he drafted the report he stated that, "I could not leave the Police Office until doing so and all three of my supervisors [Chief Bell, PO Beard and PO Tony Auriemma] stayed there making sure I did it and at times telling me what to write."

31. Chief Bell also asked PO Montoya and other officers to write Reports of Contact against PO Webster and Bell, according to Montoya, "[Bell] would even state what he wanted included in the report."

32. March 26, 2009: Apparently, as a result of the Reports of Contact that Chief Bell and PO Beard had extracted from the police officers noted above, and only 20 days after VA Attorney Mitch Tolman was sent a Request for Information and Assistance regarding PO Webster's OSC complaint, Chief Bell drafted and served on PO Webster a Suspension of Weapons Authority and placed PO Webster on an indefinite leave. The suspensions stated:

a. The purpose of this memorandum is to inform you that your access to departmental weapons is suspended for conduct prejudicial to good order. The authority for this action is contained within VHA H-0720, Section 3.e: and VHA H-0730 Sections

3.E[h] & 7.b[4][a].

b.You are instructed to immediately surrender your VA Police Badge set, Police Officer Identification [VA Form 10045] and all assigned keys to the Chief of Police. Additionally, you will clear out your assigned locker and will leave the locker open. You are restricted until further notice from entering the Police Office in Bldg. 14, to include the armory. You are restricted from the Police Administrative Office in T-1 unless you are on official government business. Moreover, access to SLC Veterans Health Administration is limited to an "official government" capacity.

c. During the tenure of this "administrative absence," you are not allowed on SLC Veterans Health Administration property unless it is for clinical care and official government business. This access request will require notification by you with the VA Police;  moreover, the entrance location will be given 5 minutes prior to your arrival. VA Police will escort you during your access request. Failure to notify VA Police personnel while accessing Veterans Affairs Health Administration property will constitute violation of USC 76-6-206 1[b][I].

d. During the period of suspension, your authority to introduce a personally owned firearm onto Departmental Property pursuant to the Law Enforcement Officer's Safety Act of 2004 [H.R. 218 ] is vacated.

33. March 31, 2009: At the VA police office, according to PO Zumwalt, Chief

Bell stated, based upon Dir. Korogi's authority, that if any officers questioned his actions

or if anyone recorded him, they would be terminated. He further boasted that he was 4-0

in eliminating personnel and he had not lost.

a. Chief Bell also boasted that he was a lion and would bite anyone who stated that he could not do something and he would go at it hard proving them wrong. Chief Bell stated that if misconduct continued to occur, that they would go down and he would continue to document them until they were terminated. Chief Bell stated he is tired of everyone questioning what he does and that he can do what he wants to and since nobody has stopped him, he must be right in what he is doing. Bell further stated that there were "persons" who had stated that he had forced them to write statements. He stated that such "persons" had no credibility with him and they didn't deserve to work at the SLC VA.

-15-

b. Also, according to Officer Ryan Zumwalt, within seven days after Chief Bell was notified he had to be interviewed for PO Webster's OSC investigation, which necessarily had to occur shortly after March 6, when attorney Mitch Tolman receive the Requests for Information and Assistance, if not sooner, Chief Bell started building a retaliatory case against Webster by gathering and dictating Reports of Contact.

34. April 6, 2009: Chief Bell called Officer Thomas Benincosa and told him to write statements concerning Officers Dana Webster and Ryan Zumwalt so that Chief Bell could, "start building a case,"against Webster and Zumwalt to remove them from the VA.

a. Benincosa was told to sit at the secretary's desk just outside the Chief's office to complete the statements. While there Chief Bell was constantly moving back and forth from this office and back to where Benincosa was sitting and would look over his shoulder as he typed his report. This caused Benincosa to feel pressured and rushed. At one point, Chief Bell felt Benincosa wasn't being specific enough on Ryan Zumwalt's statement and, "became highly agitated," and told him to go back and be more specific, and would "add things (words) to the report," and at one point even became angry and grabbed Benincosa's chair and rolled him away from the desk and then, went on to "type the last portion/paragraph of," his report.

b. Chief Bell directed Benincosa to state Chief Bell has not coerced or told Benincosa what to write.

c. Benincosa was still within his entry-level year of probation and was fearful that he would be terminated. Benincosa knew that in the past, Chief Bell had investigated officers that had refused to obey his orders to write statements and therefore believed he could not decline to do so.

d. Benincosa had previously spoken to Officer Zumwalt. PO Zumwalt told Benincosa that he he had regrets about writing a statement against PO Webster. Officer Zumwalt showed Benincosa how Chief Bell had added to and changed Zumwalt's statement to make it more powerful against Webster. Benincosa documented Officer Zumwalt's concerns and retained copies of the statement he turned in to Chief Bell.

e. Benincosa expressed concern about writing the statements and Chief Bell told him that if he did not, chief Bell could not protect him from PO Zumwalt and PO Webster if they started, "coming after him exclusively."

-16-

35. April 6, 2009: Chief Bell served identical letters of Suspension on Officer Ryan Zumwalt and PO Webster removing them from their GS-0083 Police Officer Positions.

a. Officer Scott Hess and Officer Gary Steffen, who were on active duty at Security Forces at Hill A.F.B. and worked for TW& Company, and who appeared to be ages 30 and 37, were hired to take Zumwalt and Webster's positions.

36. April 22, 2009: Human Resource Specialist Tammy Ice, sent an e-mail to all Veterans Affairs Police Officers, except Officer Dana Webster, with the subject Heading of; Lead Officer Position GS-0083-7/8.

37. April 23, 2009: The Salt Lake City VA Healthcare System opened Vacancy Announcement # **D1719-2009** for Lead Police Officer [Sgt] GS-0083-7 [Target] 8 or GS-0083-8 as noted elsewhere herein. This vacancy is the subject of PO Webster's Claim C, Event 4.

38. May 6, 2009: PO Webster and PO Zumwalt decided to apply for the position as noted in elsewhere herein. PO Webster met with Officer Zumwalt at his residence and picked up Zumwalt's application package. PO Webster drove to the Salt Lake City VAMC to turn in both PO Webster and Officer Zumwalts' application packets, for Lead Police Officer, Vacancy Announcement # **D1719-2009**.

-17-

a. Due to Chief Bell's directive that PO Webster be escorted by a VA Police Officer while on the VA premises, Webster contacted PO Ronda Harper at the VA Police Operations Center and requested a VA Police escort onto VA property and to the Human Resource Office.

b. At approx: 1610 hours, PO Ronda Harper documented in the VA Police Operations Journal, "PO Webster telephoned Police Dispatch and related he would be entering the Facility through the Sunnyside Gate in approximately five minutes to conduct personnel business at Building # T-5."

c. PO Ronda Harper witnessed PO Webster turn in both PO Webster and Officer Zumwalts' application packets. At PO Webster's insistence, the Human Resources Clerk time and date stamped his application packet for Vacancy Announcement number **D1719-2009** on 5/6/2009 at 4:25 hours.

d. PO Ronda Harper testified, "I escorted Webster to Building # T-5 without incident. Chief Bell was notified and briefed [thereon]."

e. PO Harper indicates that immediately thereafter Bell pulled her into the armory to ask her everything that she and Webster had discussed. She explained what they discussed. Chief Bell then called her a liar and dismissed her. Chief Bell then sent her an e-mail instructing her to inform her any time Webster needed access to the VA.

39. May 6, 2009: Except for PO Webster, Human Resources Specialist Tammy Ice emailed all VA Police Officers, including Ryan Zumwalt, the Salt Lake City Healthcare System Vacancy Announcement number **D1719-2009A** about a Lead Police Officer position GS-0083 7/8 opening. This announcement opened one day before Vacancy Announcement **D1719-2009** closed on 5/7/2009.

40. May 7, 2009: The Vacancy Announcement **D1719-2009** closed. Ryan Zumwalt emailed the new Vacancy Announcement **D1719-2009A** to Webster.

a. The Vacancy Announcement stated under Qualifications Requirements, that for the GS-7 you must have one year of specialized experience equivalent to the GS-6. For

-18-

the GS-8 you must have one year specialized experience equivalent to the GS-7 in Federal Service.

b. The time in grade restrictions stated that the applicants must meet the time in grade requirements of the position within [30] days of the closing date of the announcement. The Length of Eligibility stated, "Eligibility established under this announcement will be for 90 days after the closing date of this announcement. Like positions may be filled from this announcement within 90 days after the closing date."

c. Officers Webster, Zumwalt and other officers applied for the Vacancy Announcement **D1719-2009**. Officer Tressa Jordan stated to Ofc. Webster that she did not apply for **D1719-2009**.

41. May 8, 2009: The Salt Lake City Health Care System Human Resource Office

mailed a written verification to PO Webster that it had received his application for Job

Announcement # **D1719-2009**.

a. The verification stated, "Thank you for your response to our current job opening and for your interest in the VA Salt Lake City Health Care System."

b. The written verification stated, "We are currently reviewing applications for this position to determine the best qualified applicants."

42. On May 14, 2009: At approximately 1500 hours, PO Webster met with Officer

Zumwalt at his residence and picked up Zumwalt's Vacancy Announcement **D1719-**

**2009A** application packet.

a. PO Webster then drove to the Salt Lake City VAMC and contacted PO Ronda Harper at the VA Police Operations Center to request an escort.

b. PO Ronda Harper escorted PO Webster to the Human Resources Office and PO Webster submitted both PO Webster and Officer Zumwalts' application packets for Vacancy Announcement #**D1719-2009A**.

c. At approximately 1605 hours, PO Harper noted in the VA Police Operations Journal, "PO Webster telephoned Police Dispatch and related he would be entering the

property through the Sunnyside Gate in 10 minutes to take care of business in T-5. I escorted WEBSTER to T-5 at 1615. WEBSTER exited the facility at 1630 hours through the Sunnyside Gate."

d. PO Webster had his application packet Date and Time stamped by the Human resources Clerk on 5/14/2009 at approx: 4:12 hours.

e. Sometime later, PO Webster verified through Human Resources that Officers Webster, Zumwalt, Jordan and Vouvalis had applied for the vacancy announcement #**D1719-2009A**.

43. May 15, 2009: Healthcare System Vacancy Announcement number **D1719-2009A** for Lead Police Officer position GS-0083 7/8 closed on 5/15/2009.

44. May 20, 2009: PO Webster received written notice that he was passed over for position of Lead Police Officer for the Vacancy Announcement number **D1719-2009.**

a. PO Webster did not receive any verification from Human Resources of his application for Vacancy Announcement number **D1719-2009A** or any written notification that he was not selected for the position. It appears, therefore, that the Agency manipulated these two positions so that officers Zumwalt and Webster did not have to be considered for them, and so that Jordan could be selected for the position she applied for.

b. Just prior to leaving for the Basic Police Course at the Law Enforcement Training Center in Little Rock, AR, Chief Bell selected PO Jordan for the position of Lead Police Officer either under the Vacancy # **D1719-2009** or **D1719-2009A** .

c. Officer Jordan's entry on Duty Date was 6/22/2008 and therefore Jordan did not meet the one year time in grade restrictions within [30] days of closing of the announcement for GS-8 as required.

d. There were no Performance Based Interviews for the position, nor was a board or panel convened to consider the applicants.

e. At the time she was promoted into this position, Jordan was approximately 39 years of age (DOB July 14, 1969) and she had less experience than PO Webster as a VA Police Officer. At the time, PO Webster was 53 years of age and had the qualifications as noted above that Jordan did not have.

f. Moreover, Tressa Jordan had allegedly been disciplined for using inappropriate

-20-

language in the workplace by using an unknown Indian word against PO Beard  and Chief Bell that meant they spewed evil, and for being disrespectful to a management official. Also according to Korogi and PO Beard, Chief Bell allegedly had problems with Jordan because she: "was supposedly making fraudulent comments about Gary Steffen living with Chief Bell; was engaged on several incidents in which Jordan had verbal altercations with other police officers regarding operating procedures, work assignments; she had problems following direct orders; she disagreed with management's directions to her; and she also had problems with certain procedures and processes in place to handle matters of the service."

45. May 23, 2009: The Salt Lake City VAPD Call Sign List did not show Officers

Webster or Officer Zumwalt listed as Police Officers.

46. June 2, 2009: Acting Dir. Korogi left PO Webster a message on his home

phone to call her at the Salt Lake City VAMC. PO Webster called. The phone was picked

up, but not answered directly. PO Webster heard a male voice, sounding like VA-OIG

Agent Mike Morris, stating, "Oh here he is now," and the phone was hung up. It sounded

like Agent Morris' voice and the tone was dismissive and negative.

a. PO Webster called back. Dir. Korogi answered. She advised PO Webster that she was the only one in the office and that she was rescinding his Administrative Absence and Weapons Authority Suspension and authorizing Webster to return to work on the Sunday night shift, at 1845 hours. Korogi further advised Webster to contact PO Beard for scheduling of Firearms qualification.

47. June 3, 2009: At approx1630 hours, PO Webster received a phone call from

Chief Bell, who was attending the LETC Basic Police Course in Little Rock, AR. Chief

Bell advised PO Webster that he had found out that Webster had been retaliated against

by Chief Cowley and PO Ruble, that Webster had been cleared of all investigations and

had been returned to duty status with a clean slate.

    a. Chief Bell, however, advised PO Webster that he had some hurdles to get over and Chief Bell thought that Webster would not be able to forget what had happened to him. Chief Bell stated that he had talked to the Chief in Seattle and that he would assist Webster with whatever he wanted to do, stay in Salt Lake or transfer to Seattle.

    b. Chief Bell further advised Webster that he would be going to the Firearms Instructor Course in Little Rock, AR in August and that not only was he going to be a Firearms Instructor, but that he would be the taking over the Firearms Program.

    48. June 5, 2009: At approximately 1130 hours PO Auriemma re-issued Webster

his VA Police badge set, keys and I.D card, which were in a locker in the Lieutenant's

office. PO Webster's assigned duty firearm had been re-issued to Officer Gary Steffen.

    a. During the range qualification at the Lee Kay Range, PO Auriemma advised PO Webster that he was glad to see Webster back, that he was upset that he had to escort Webster out of the facility and that Chief Bell was going to talk to Aureimma after he returned from the LETC Academy.

    b. PO Auriemma advised Webster that he did not know if he was going to be the Firearms Instructor anymore and that the VA was vindictive and wanted to put people under the bridge and homeless.

    49. June 25, 2009: Officer Ryan Zumwalt filed a Formal EEO Complaint for

Hostile Working Environment and Discrimination.

    50. June 2009: Because Chief Bell had indicated to Webster, Zumwalt and others

that he viewed Webster to be in league with Zumwalt, upon receiving Zumwalt's EEO

complaint he would assumed PO Webster to have recruited Zumwalt to file it. Moreover,

the VA had on record that Webster was Zumwalt's field training officer and that he

therefore would have been called as a witness for Zumwalt.

51. June 25, 2009: PO Webster asserts that the VA retaliated against him for being

witness in Zumwalt's MSPB complaint and an anticipated witness in Zumwalt's EEO

complaint, at which he testified in October 2009 as indicated hereafter.

52. July 2, 2009: At approximately 0700 hours, PO Beard advised PO Webster that

Chief Bell wanted to talk to him concerning the VA Police firearms Instructor position

and requested that PO Webster meet with Chief Bell in his office.

    a. When he was at the Basic Police Officer course at LETC in Littlerock, AR,
Chief Bell advised PO Webster that Dir. Korogi contacted him and directed him to
conduct several Fact Finding Investigations concerning PO Webster when he returned to
Salt Lake City.

    b. Chief Bell tried to convince Office Webster that he was tired of conducting Fact
Finding Investigations and was going to tell Dir. Korogi that he was not going to conduct
any more Fact Findings on PO Webster.

    c. Chief Bell stated that he was already in trouble with Dir. Korogi for telling her
no several times on other issues. Chief Bell stated that Korogi had directed him to
conduct searches on subjects at the Medical Center and that he had told her that it was
illegal.

    d. Chief Bell stated that he had a meeting with Dir. Korogi at 11:00 hours and that
he felt the he would likely face termination from his position as the Chief Of Police.

    e. Chief Bell stated that the VA would have one hell of a lawsuit against them if
they terminated his employment.  Chief Bell acted like he was scared and attempted to
illicit sympathy from PO Webster and asked what he should do and if PO Webster
thought he was going to get fired.

    f. Chief Bell advised PO Webster that Chief Cowley and PO Ruble were crooks
and should be in jail or prison for what they had done to Webster and that Webster should

sue them.

g. Chief Bell then indicated that he was directing PO Beard to send an email to LETC and replace PO Ronda Harper with PO Webster for the VA Police Firearms Instructor Course in August.

h. Chief Bell advised PO Webster that he was going to be the Primary Firearms Instructor for the VA Police and he was going to the Firearms Instructor Course, Sig Transition Course and the Sig Armorer Course. Bell also stated that Webster was the most qualified officer in the department to attend the Instructor Course and that if there was a Tactical Firearms Instructor Course after the Instructors Course, he would keep PO Webster down in Little Rock, AR to complete the course.

i. Chief Bell told PO Webster that he was going to advise Dir. Korogi that there was nothing there in the Fact Findings and that he was going to send PO Webster to the Firearms Instructor Course. PO Beard left the office. Then Chief Bell advised PO Webster that he had his back and that he wanted PO Webster to promise that he would not discuss their conversation with anyone else, not even his FOP attorney, or he could get into a lot of trouble.

j. Chief Bell then walked up to PO Webster and hugged him and asked Webster if he could hang around for a while as it was almost 11:00. At that time, Chief Bell was scheduled to meet with Associate Dir. Korogi and was worried he may be fired.

k. PO Webster walked out to his vehicle and observed as Chief Bell and PO Beard walked over to Dir. Robin Korogi's office and then returned a couple of minutes later.

l. Chief Bell advised PO Webster that Dir. Korogi had refused to see him, stating that she was leaving to go back East to attend training to conduct Administrative Investigations Boards and had sent him an email to reschedule for next week.

m. Chief Bell contacted PO Webster at the Salt Lake City VAMC, and advised PO Webster that he was exonerated and would be going to the Firearms Instructor Course and would be the Primary Firearms Instructor for the Salt Lake City VAMC.

53. July 2, 2009: PO Webster advised Chief Bell that he had heard from two different sources that Chief Bell had received the green light to rid the department of all undesirable officers, utilizing any means necessary. PO Webster asked Chief Bell if that was true. Chief Bell stated, that it was true, but authorized only to use progressive

discipline to terminate police officers.

54. July 6, 2009: PO Webster received a written directive to attend the Firearms Instructor Course at LETC in Little Rock, AR., for August 10- 25, 2009.

55. July 7, 2009: PO Webster submitted to Director Steve Young a FOIA request for unedited copies of all Reports of Contact. Specifically, he requested copies of written statements and documentation that was submitted to Chief Bell concerning any complaints against PO Webster from March 1, 2009 to July 6, 2009 that were authored  at Chief Bell's direction by the following list of VA Police Officers and Department of Veterans Affairs personnel.

a. The employees listed were Lt. James Ruble, Lt. Ron Beard, Lt. Tony Auriemma, PO Fisher, PO Ronda Harper, PO Gene Montoya, PO Tressa Jordan, Officer Ryan Zumwalt, Officer Floyd Clark Officer Wayne Vouvalis, Officer Steve Anderson, Officer Tom Tudor, Officer Tom Benincosa.

b. PO Webster submitted a second FOIA request to the Director requesting a complete and unedited copy of Uniform Offense Report 03-06-26-0145 printed on April 19, 2007 at 12:52 hours and identified as Attachment #1 by Inspector McCamley.

56. July 7, 2009: Chief Bell retaliated against PO Webster for filing FOIA request as indicated below.

57. July 13, 2009: Chief Bell attempted to contact PO Webster at his residence but he was absent. PO Webster called Chief Bell back. Chief Bell advised Webster that he had a meeting with Dir. Korogi and that he was asked by Dir. Korogi if he knew that PO

Webster had filed a FOIA Request.

a. Then Chief Bell asked PO Webster if he had filed a FOIA request. PO Webster advised Chief Bell that he had filed two FOIA requests as noted above through Facility Director Steve Young and not Dir. Korogi.

b. Chief Bell stated that it was just going to cause problems. Chief Bell then asked PO Webster what he was going to do with the FOIA requests, why he had written the FOIA requests, and then directed PO Webster to destroy them. Then Chief Bell again stated that the statements were going to cause problems.

c. Dir. Korogi acknowledged at her deposition that Chief Bell was informed that PO Webster had made a FOIA request.

58. July 19, 2009: PO Webster utilized annual leave and was not working at the Salt Lake City VAMC.

a. While PO Webster was gone, Officer Gary Steffen completed a Report of Contact asserting that on July 19, 2009 PO Webster had researched on the internet the meaning of the word "Oscar" that was being assigned as a radio call sign.

59. July 20, 2010: PO Beard sent an email to all VA Police Officers with the subject title of: New Call Signs: "Please see the revised call sign list posted on the dry erase board."

a.  At the same time, FOIA Officer Francis Marks sent Webster written

confirmation of receiving the FOIA request for the officer statements and identified the assigned tracking number 09-0063-F.

b. According to PO Fisher, at the same time, Chief Bell instructed PO Fisher in the VA Police Operations Center at 0100 hours that he would be conducting a Fact Finding Investigation on PO Webster.

c. Regarding this event, PO Fisher indicates, "Chief  Bell called me into his office for counseling regarding PO Webster and PO Anderson being a problem to his department. He  also stated, 'either get them or help us get them or we will get you.'"

60. July 21, 2009**:** FOIA Officer Francis Marks sent Webster written confirmation of receiving the FOIA request for UOR #03-06-26-0145 , and identified the assigned tracking number as 0900827-F.

61. July 22, 2009: Chief Bell sent an email to Rose Pierce at the Law Enforcement Training Center in Little Rock, AR.

a. The email stated: "Rose, Please replace Officer Dana Webster with PO Benincosa for the Firearms Instructor Course scheduled for August 10th-25th. Thank you very much for your assistance."

62. July 23, 2009**:** As a consequence, as noted above, PO Webster was not selected for firearms and instructor course.

63. July 28, 2009: PO Ronda Harper advised PO Webster that PO Benincosa was going to the Firearms Instructor Course in place of PO Webster.  PO Harper was told there were no funds to send Webster. However a week later she was told that PO Bennicosa would attend the same course.

-27-

a. PO Fisher and PO Anderson told PO Webster that on the same day, Chief Bell interviewed PO Fisher and Officer Steve Anderson during a Fact Finding Investigation concerning PO Webster.

64. July 29, 2009: PO Beard called PO Webster at his residence and advised him that his training course for Firearms Instructor at the LETC in Little Rock, AR had been postponed because of budget restraints. PO Beard informed Webster that if he had any questions he was to contact Chief Bell.

65. July 29, 2009: PO Webster attempted to contact Chief Bell about not going to the firearms instruction course five times during the day shift and could not reach Chief Bell.

66. July 30, 2009: Chief Bell wrote a Memorandum of Record, re, Appointment of Police Firearms Instructor. It stated that PO Auriemma is appointed as the Primary Firearms Instructor and PO Benincosa is appointed as an Alternate Firearms Instructor.

a. At the time, PO Auriemma was already a firearms instructor. PO Benincosa was about 26 years of age. Benincosa had less experience than PO Webster. PO Webster was 53 years of age and had the qualifications as noted above.

b. Regarding this incident, PO Benincosa wrote a statement that includes the following:

i. July 30, 2009: I Thomas Benincosa was appointed to be a firearms instructor by former Chief Al Bell for the Salt Lake City Veterans Affairs Police Department . . . The plan was to start me out as an alternate firearms instructor to PO. Tony Auriemma and then to have me take over as the primary after completion of the course down in Little Rock, AR.

ii. I had some concerns with this decision because I knew that a decision

-28-

was already made to have Officer Dana Webster as the Primary Instructor . . . there were in fact officers who thought it was a great fit for Webster to be instructor. Reason was that Officer Dana Webster has a great background from the Air Force with Combat Arms Training (CATM).

   iii. Shortly after a week or two Chief Bell and some of the Police Administrators were upset with PO Webster and his involvement with, as they put it, "internal investigations" and of him contacting a lawyer or advisor. They wouldn't tell me any specifics other than they wanted Webster out of being any sort of an instructor and I was selected to conduct the program. They gave me 3 days notice to pack and told me that I was going to the LETC (Law Enforcement Training Center) in Little Rock, AR to be the new firearms instructor . . .

. . . .

PO Webster is qualified in every way to be a firearms instructor . . .

. . . .

. . . [W]e were being told that Webster is trouble and not to mess with him.

67. July 30, 2009: Salt Lake City FOIA Officer Francis Marks provided a written response to PO Webster's FOIA request on July 7, 2009 and stated:

a. This information is being withheld under FOIA exception 5 [5 U.S.C 552 [b] [5], "deliberative process privilege" and FOIA exemption 6 [5 U.S.C. 552 [b] [6], all information which if disclosed, would constitute a clearly unwarranted invasion of personal privacy."

68. July 30, 2009: As noted in ¶ 74 above and ¶ 78 below, PO Webster was not selected for firearms instructor.

69. August 3, 2009: Officer Steve Anderson advised PO Webster that Officer Benincosa was appointed the Firearms Instructor Course instead of PO Webster.

70. August 10, 2009: PO Benincosa attended the Firearms Instructor Course at the

LETC in Little Rock, AR.

a. On the same day, SLC VA FOIA Officer Francis Marks responded to PO Webster's FOIA request dated July 7, 2009 requesting a copy of Uniform Offense Report 03-06-26-0145, printed on April 19, 2007 at 12:52 hours.

b. Francis Marks response stated, "We have enclosed the information you requested. This report was printed on July 30, 2007, we could not find this report showing a date/time printed as April 18, 2007 at 12:52 hours. All information which if disclosed, would constitute a clearly unwarranted invasion of personal privacy had been withheld."

71. August 11, 2009: PO Beard directed Officer Dana Webster to meet with him in

Building T-1, regarding a Fact Finding Investigation.

a. PO Beard stated that he had a Report of Contact from another Officer [Steffen] that stated that PO Webster had misused government computer to Google the name "Oscar" and then printed a definition of the word and left a copy laying inside the VA operations office. While this was factually true, PO Webster attests that he did this to assure him that the name did not have negative connotations and to allay the concerns of PO Hess who said he didn't like being called an, "Oscar Meyer Wiener." This type of action was de minimis conduct because it was frequently engaged in by all the officers at the SLC VAMC.

b. At that time, PO Webster advised PO Beard that he had asked Officer Hess how he liked the new call signs and if he was getting used to it. Officer Hess stated, "Oh, I like being called an Oscar Meyer Wiener." This statement by PO Hess was part of some same innocuous banter engaged in by several officers regarding the new call sign.

c. PO Beard explained that he did not view this incident as misconduct but was directed by Chief Bell to issue a written Verbal Counseling or an Admonishment to be placed into Webster's OPM file.

d. PO Beard wrote PO Webster a Letter of Counseling [Misconduct].  It stated: "I received allegations that on July 19. 2009 at approx: 1900 hours, you conducted an internet search while on duty utilizing a Government computer for the definition of the word Oscar. The internet search was perceived to be in response to your new radio call sign 'Oscar-1' issued to you on approx: 18 July 2009. In addition, it is alleged on approximately 20 July 2009 you placed a printed copy of the definition for the word

Oscar, found during the internet search you conducted in plain view inside the ops office on approx: 20 July 2009."

   e. Shortly after, PO Beard advised PO Webster that Veterans Affairs Police Chief Casey from the Seattle VAMC, had contacted Chief Bell and revealed to PO Beard that he had heard a lot of negative things about PO Webster and wanted to know what the story was.

   f. PO Beard advised PO Webster that Webster's name was well known in the Veterans Administration, at the Police Chiefs conference, at the LETC Academy and in Washington D.C.

   g. On the same day, Chief Bell had a conversation with PO Webster after the Fact Finding Investigation concerning training opportunities and promotion.

   h. Chief Bell asked why PO Webster wanted to try to transfer out of Salt Lake City and to another VAMC. PO Webster responded to Chief Bell that he believed Chief Bell and others had created a hostile working environment at the SLC VAMC and that there was no opportunity for him for training, advancement or promotion.

   i. Chief Bell then advised PO Webster that there was going to be a Sergeant opening in three months that PO Webster could apply for. Chief Bell then pointed at PO Beard and stated that Beard knew what he was talking about.

   j. Chief Bell advised PO Webster that Webster was number one on his promotional list and that he would promote PO Webster to Sergeant in three months. That all Webster had to do was to come to work, do his job and keep his mouth shut.

   k. Chief Bell advised PO Webster that PO Beard was his witness and that he would even call Webster's attorney and tell him the same thing, if PO Webster stayed at the SLC VAMC.

   l. Chief Bell again advised Webster to keep his mouth shut and not even talk to the other officers on the other shifts.

   72. August 17, 2009: PO Webster had a conversation with PO Auriemma outside

of Building T-1.

   a. PO Aureimma advised PO Webster that Chief Bell wanted all of the older officers out of the department and wanted to replace them with new hires from Security Forces at Hill A.F.B. and that one by one, the older and experienced officers were going to be removed or forced out, including himself.

b. PO Auriemma advised PO Webster that PO Webster and PO Anderson had been placed on the same shift together with the intent that Webster would get irritated with Anderson and do something that allowed the Agency to terminate Webster. Since that was not happening, PO Fisher was being directed to go after both PO Webster and Officer Anderson.

73.  August 25, 2009: Kelly C. Atkinson, Executive Director of the Fraternal Order of Police, Utah State Lodge sent Chief Bell a cease and desist request for his actions for unfair labor practices towards the Veterans Affairs Police Officers, who were members of FOP, including PO Webster. The letter states:

a. ...Your open partiality and favoritism of the AFGE Union while at the same time threatening members of FOP is a clear violation of Title 5 and constitutes unfair labor practice . . . According to Title 5 as an agent of the employer you may not encourage or discourage membership in any organization. In addition FOP has obtained evidence that you have targeted FOP members for unfair discipline while ignoring or disregarding the exact same behavior on the part of AFGE members. Finally, you recently threatened a member with demotion as a result of his membership in FOP.

b. In behalf of FOP, the nation's largest police union, we ask that you immediately cease and desist in such actions . . ."

74. August 27, 2009: PO Beard sent all officers an email containing the slides from the 4th quarter FY09 Staff Meeting. The slides did not show any additional duties being assigned to PO Webster.

a. At the same time, PO Webster asked Officer Hess if he had received any disciplinary action in July concerning his comment, "I like being called an Oscar Meyer Wiener."

b. PO Hess stated he was asked if he said it, he said yes and then he was told not to talk about it anymore.

-32-

c. On the same day, at approx: 0800 hours. Chief Bell and PO Beard conducted a VA Police Quarterly Staff Meeting in the conference room of building #4.

d. Chief Bell spoke for approx: 10 to 15 minutes and made several statements relative to the representation of VA Police Officers by the Fraternal Order of Police.

e. Chief Bell stated that any action that he proposed or had taken against any officer was already reviewed and approved by the AFGE Union.

f. Chief Bell stated that if any VA Police Officer asked for representation by an FOP Attorney, he would personally consider the request a threat to him and he would initiate a Fact Finding Investigation against the officer for Workplace Violence. He also stated that he would initiate progressive disciplinary action and terminate the officer.

g. Chief Bell stated that a couple of officers continued to cause problems and that they continued to test him, that he did not need to mention them, because they knew who they were.

h. Chief Bell stated that if those officers could not do their jobs, there were people out there that wanted their jobs and that he got phones calls every day from people asking if there were any openings for police officers.

75. August 28, 2009: PO Beard sent PO Webster an email that stated, "At this time you will not be assigned as the alternate firearm instructor."

a. At this time, PO Webster sought to enhance his opportunities for promotion and advancement for the Vacancy Announcements for Lead and Supervisory Police officer positions by pursuing further training and education.

b. PO Webster signed up for several Supervision and Management Level courses through the Utah State Peace Officers Standards of Training Academy. These courses would qualify PO Webster for the Utah POST Mid-Management Course.

76. September 7, 2009: PO Webster had a conversation with PO Tony Auriemma in parking lot number 18.

a. PO Auriemma advised PO Webster that he had overheard a conversation between Chief Bell and PO Beard to the effect of, "Beard you're going to have to trust me, I have a plan to get rid of these guys."

b. PO Auriemma advised PO Webster that when Chief Bell was attending the VA Police Academy at LETC, and PO Auriemma was the Acting Chief of Police, Chief Bell had had all of his emails forwarded to him.

c. PO Auriemma stated that one email was between Chief Bell and one of his former bosses in Security Forces at Hill A.F.B. That the email stated words to the effect that Bell could get the person a job at the Veterans Administration as a Police Officer, if he needed one.

77. September 9, 2009: PO Webster received an email from an FOP attorney

stating that an OSC Settlement Agreement had been signed by the Director of the Salt

Lake City VAMC.  The agreement stated:

a. In consideration for the mutual promises and assurances. Herein, the Parties, Dana Webster ("Employee") and the U.S. Department of Veterans Affairs ("VA") hereby agree to settle and resolve all claims, disputes and causes of action raised in Office of Special Counsel ("OSC") complaint number MA-08-0937 . . .
         . . . .
b.  Employee agrees to:
c. Withdraw his complaint, MA-08-0937, to the Office of Special Counsel (OSC) by his signature below.
d. Waive any and all rights he may have in any forum to contest or challenge any action identified in ¶ 1a. that was the subject of MA-08-0937 . . . Employee agrees not to initiate in any forum any further legal action against the VA, its agents, employees, or former employees, for any actions that were the subject of his OSC complaint.

78. September 10, 2009: Salt Lake City Health Care System opened Vacancy

Announcement Number **D2008-2009**, for Supervisory Police Officer GS-0083-9 [Target

9] or GS-0083-9. This vacancy is the subject of PO Webster's claim Claim C, Event 10.

a. The Qualifications Requirements stated; For GS-8 you must have one year specialized experience. For GS-9 you must have one year specialized experience at the

next lower grade.

79. September 13, 2009: PO Webster completed the Utah POST [24 hour] Field

Training Officer Course.

80. September 23, 2009: PO Webster completed the Utah POST [24 hour]

Employee Discipline and Administrative Procedures Course.

81. September 24, 2009: Chief Bell arrived at the VA police operations Center and

conducted a random uniform and equipment inspection and then asked PO Webster some

questions.

    a. When Chief Bell did not get the exact answers he wanted, Chief Bell threatened
Webster that he was going to check PO Webster's training folder to see if Webster had
signed off that he had read the training units.
    b. Chief Bell stated that if Webster did not know the answers to the questions, but
had signed off the training areas, then Webster had committed fraud and then Chief Bell
could have Webster decertified as a Police Officer.

82. September 24, 2009: PO Beard had previously advised PO Webster that there

was only one applicant for the position of Supervisory Police Officer on Vacancy #

**D2008-2009**, but that this week PO Beard advised PO Webster there were three.

    a. PO Beard advised PO Webster that he was voting for Webster to be the next
Supervisory Police Officer.

83. October 7, 2009: The Salt Lake City Health Care System opened Vacancy

Announcement Number **D2010-2010** for Supervisory Police Officer GS-0083-9 [Target

10] GS-0083-10. This vacancy is the subject of PO Webster's Claim C, Event 11.

    a. The Qualifications Requirements stated; "For GS-9 you must have one year specialized experience in the next lower grade, GS-8."

    84. October 8, 2009: PO Webster completed the Utah Post [32 hour] Supervision

and Leadership Course.

    a. It must be noted, that after Officer Zumwalt filed an EEO complaint in June 2009 for non-promotion alleging bias, the Agency thereafter used Performance Based Interviewing for the Supervisory Police Officer position promotions.

    b. Three VA Police Officers were interviewed for the Supervisory Police Officer position including Officer Wayne Vouvalis, Officer Ryan Zumwalt and PO Webster.

    85. October 13, 2009: PO Webster was scheduled for his Performance Based

Interview for Supervisory Police Officer Vacancy # **D2008-2009** at 12:00 noon, on his

work day.

    a. This required PO Webster to get off of work at approx: 0715 hours, after working a 12.5 hour shift, drive 37 miles home to change, drive 37 miles back to the VAMC to attend the Performance Based Interview and then to drive 37 miles back home and then return to work at 1845 hours without sleep and being up for over 24 hours.

    b. PO Webster was totally exhausted during the interview and had to use sick leave for his night shift, as a result of not getting any sleep that day. This was out of custom for the VA that had always accommodated the POs' schedules.

    c. At the same time, because PO Webster was aware of the VA officers' schedules, he knew that Officer Vouvalis was allowed to attend his Performance Based Interview on his day off.

    d. Also, because PO Webster was aware of the VA officers' schedules, Officer Ryan Zumwalt attended the interview during the day when he was still on Administrative Leave Status as noted above.

-36-

86. October 15, 2009: At approximately 0950 hours, Chief Bell was contacted by

an EEO Investigator and interviewed concerning Officer Zumwalt's EEO complaint.

a. Chief Bell selected PO Gene Montoya and Officer Wayne Vouvalis to testify in the EEO complaint process.

b. At approx: 4:57 PM Officer Vouvalis was interviewed for Ryan Zumwalt's EEO Complaint.

c. PO Webster was unavailable to be interviewed, but was identified as a witness in Officer Zumwalt's EEO complaint.

d. Chief Bell testified in a deposition for Officer Ryan Zumwalt's EEO Complaint that he had worked for TW & Company as an Armed Security Officer prior to being hired as the Chief of Police at the Salt Lake City VAMC.

e. PO Vouvalis testified at PO Zumwalt's EEO Complaint that he only had one year of experience when he was selected as lieutenant over PO Webster and that when he applied for the Sergeant's position immediately prior to being selected as the lieutenant, he was not chosen because he lacked experience for this position and the other applicants were better qualified than he. The only qualification he had over PO Webster was he was younger. On August 6, 2010, PO Vouvalis was 26 years old.

f. PO Webster asked PO Beard when the Lead Police Officer announcement was going to be coming out. PO Beard stated that Chief Bell was going to advertise the Lead Officer position nationwide as they were at the bottom of the barrel for officers to promote to Sergeant.

87. October 16, 2009: PO Beard and Chief Bell instigated a workplace Violence

Incident in the VA Police Operations Center against PO Webster. The incident was

reported to Human Resources for investigation. The incident occurred when Webster

mentioned to Beard the truthful event that Beard had failed to sign in a weapon and Beard

took offense to it and aggressively approached Webster like he was going to hit him and

said, "Are you calling me a liar." Bell was present and was laughing.

88. October 19, 2009: At approximately 1300 hours, PO Webster arrived at the

SLC VMAC for a scheduled meeting with Associate Director Korogi regarding the

Workplace Violence Incident with PO Beard and Chief Bell.

    a. Acting Associate Allison Glass met with PO Webster and advised PO Webster that Robin Korogi had gone home sick, as she had a death in the family.

    b. PO Webster met with Allison Glass for the complaint and advised Glass that PO Beard and Chief Bell were causing a hostile working environment in the VA Police Department.

    c. At approximately 1945 hours, PO Gene Montoya advised PO Webster that Officer Wayne Vouvalis had stated that he was selected for the Supervisory Police Officer position and that he had turned the position down.

89. October 20, 2009: A Salt Lake City VAPD Call Sign Sheet showed that PO

Webster was number one in seniority with the call sign of Oscar -1.

    a. PO Beard sent an email out to PO Tom Tudor, age 64, advising him that his tour of duty would change from day shift to night shift. This was to provide the new dispatchers, about ages 25-30, day shift positions.

90. October 21, 2009: PO Webster was not selected for the position of Supervisory

Police Officer Vacancy # **D2008-2009**. PO Vouvalis was promoted into this position.

This vacancy is the subject of PO Webster's Claim C, Event 10.

    a. Chief Bell was the selecting official for Vacancy # **D2008-2009**. Chief Bell had appointed Officers Beard, Stritikus and someone else as the panel members. At the time, PO Vouvalis was 24 years of age and only had one year experience as a VA police officer. At the time, PO Webster was 53 years of age and had the qualifications as noted above that Vouvalis did not have.

91. October 21, 2009: PO Webster received written notice from Lisa Porter,

Human Resources Director, regarding Vacancy # **D2008-2009**, stating; "You were

qualified and referred for consideration but not selected at this time."

a. Regarding the Agency's failures to promote Webster in Vacancy # **D2008-2009**,
PO Benincosa wrote a statement that includes the following:

i. Webster has put in for promotions numerous times . . . I feel he was the most
qualified out of the applicants that had applied. Officer Vouvalis put in for the job
opening but wasn't even hired here for a year . . . He was never in any leadership courses
inside of the VA. . . The Chief and PO Beard were going around to many of the Officers
to get more people to apply for the Lieutenant opening but he at least needed 3 people to
apply so that the opening could stay in house and preventing it from being opened to the
outside . . . During shift change one day PO Vouvalis had mentioned to Gray, Montoya,
and me that Chief Bell had made it perfectly clear that he did not want Webster anywhere
as a Lieutenant. Vouvalis also stated . . . he had declined wanting anything to do with
being a Lieutenant . . . Vouvalis said he then finally accepted the position because the
Chief was getting upset because under no circumstances was Webster to be a Lieutenant.
[Vouvalis also made this statement to both PO Fisher and PO Montoya. PO Montoya
indicates that Bell also approached him to urge him to apply for the position.]

ii. From that time forward the Chief conducted the interviews in a manner that was
favorable to Vouvalis . . .

92. October 22, 2009: PO Beard called PO Webster over to Building T-1 and

issued Webster a Written Verbal Warning [Misconduct] for failure to report a missing

weapon in the armory to a Supervisor. This warning was invalid. What had happened is

that PO Webster had reported the incident to PO Fisher, who then reported it to PO

Beard.

a. The Salt Lake City Health Care System opened Vacancy Announcement

-39-

Number **D2069-2010** for Lead Police Officer GS-0083 -7 [Target 8] or GS-0083-08. This vacancy is the subject of PO Webster's Claim C, Event 13.

b. The Qualification Requirements stated; "For GS-7 you must have one year specialized experience equal to the GS-6 in Federal Service."

93. October 24, 2009: At approx: 1300 hours, PO Gene Montoya advised PO

Webster that Chief Bell had contacted both PO Montoya and Officer Wayne Vouvalis and

advised them that they were selected randomly to be interviewed by the EEOC

Investigator regarding Officer Ryan Zumwalt's EEO complaint on 10/15/2009.

a. PO Montoya advised PO Webster that he told the EEO Investigator that he did not even want to come to work anymore as a result of the Hostile Working Environment at the Veterans Affairs Police department.

b. PO Montoya advised PO Webster that Chief Bell had made statements after Officer Ryan Zumwalt was placed on Administrative Leave that he was [3 for 3] for getting rid of people that he did not want—PO Lyzenga, Officer Zumwalt and another officer in the department, who he did not mention, which could have only meant PO Webster.

94. October 26, 2009: At approx: 0700 hours, PO Webster met with Dir. Korogi

regarding Workplace Violence Incident by PO Beard.

a. PO Webster reviewed the incident with Dir. Korogi and requested an Administrative Investigation Board be convened to investigate Chief Bell and PO Beards' creation of a hostile working environment within the VA Police department. Dir. Korogi stated that she knew that PO Webster had a binder with information in it and she wanted a copy of it. Korogi stated that she would only conduct an Administrative Board if she could not get the information any other way.

95. October 27, 2009:  PO Webster was not selected for the position of

Supervisory Police Officer/Cpt., [Document] for Vacancy # **D2010-2010**. PO Beard was

promoted into this position.

a. Chief Bell was the selecting official who promoted Beard for this promotion and had selected Officers Vouvalis, Stritikus and another person to sit on the selecting board. At the time he was promoted to this position, Beard was approximately 33 years of age and had less experience than PO Webster. At the time, PO Webster was 53 years of age and had the qualifications as noted above that Beard did not have.

96. October 27, 2009: PO Webster received written notification for Vacancy

Announcement Number **D2010-2010** for Supervisory Police Officer/Cpt. The written

notification stated; "You were not qualified, it was determined that you lacked the

specialized experience requirements for the position."

97. October 28, 2009: PO Beard sent out an email with the subject heading of:

Congratulate the New Lieutenant.

a. It stated:  Please take time to congratulate Officer Wayne Vouvalis who was selected for the recent Lieutenant promotion.
b. PO Fisher wrote a Memorandum to Officer Dana Webster regarding the Weapons sign out sheet, which PO Beard utilized to write a Written /Verbal Warning to PO Webster.
c. On this same day, PO Fisher stated, "On October 20, 2009 at about 0700 hours, I gave PO Beard the VAPS police report of PO Webster regarding a possible missing weapon in the arms room. I informed PO Beard that PO Webster police reports was just an informational report that would not be flagged by the VAPS or Washington D.C. I informed PO Beard that I had tried to delete the report from the system and could not. PO Beard informed me that he would be removing the report from the system and that he would not be informing the Chief about this. PO Beard said to me, 'don't worry about this I'll take care of it.'"
d. On this same day at approx: 2030 hours, VA Police PO Benincosa entered the VA Police Operations Center to completed administrative paperwork for the police

firearms program. Officer Benincosa advised PO Webster that he was originally advised that Webster was going to be the Primary Firearms Instructor and the he was going to be the Alternate Firearms Instructor.

e. Officer Benincosa further stated that in July with only a couple of days notice, he was advised that he was going to be the Primary Firearms Instructor, Tactical Instructor and Sig Armorer and that Officer Gray was going to be the Alternate Firearms instructor.

f. Officer Benincosa stated that Chief Bell had directed him and other VA Police Officers to write Reports of Contacts on PO Webster and Officer Zumwalt in March or April of 2009. That he was told by Chief Bell that he had to write the Report of Contacts. That now he knows that he did not have to write them and that they are voluntary and not mandatory as he was directed.

g. Officer Benincosa stated that he is now refusing to write anymore Report of Contacts for Chief Bell.

h. Officer Benincosa stated that he had found out that Officer Gary Steffen was living with Chief Bell when Steffen was separated from his wife.

i. Officer Benincosa stated that Chief Bell worked as an Entry Controller making $21.00 per hour for TW &Company at Hill A.F.B for a year or so while he was still on active duty in Security Forces. That other senior NCO's in Security Forces also worked for TW & Company while they were on active duty.

98. October 29, 2009: PO Webster's EEO testimony was taken by telephone.

99. October 29, 2009: PO Webster was interviewed by an EEO Investigator for

Officer Ryan Zumwalt's EEO Complaint.

a. At approx: 11:00 hours, PO Webster received in a phone call from VA Police Officer Robert Pressley who stated that he was on active duty with Chief Bell at Hill A.F.B. and that he had applied for a dispatcher position at Salt lake City, Utah.

b. Pressley stated that he was having problems with his landlord not wanting to let him out of his lease and did not know if he was going to be able to transfer to Salt Lake in time to fill the position.

c. PO Webster overheard Chief Bell ask Pressley for the number of his landlord and then stated that he would call and take care of it.

-42-

100. October 30, 2009: PO Tressa Jordan stated that Chief Bell had attempted to
get her to write a Report of Contact on PO Webster and had gotten several other females
to write Reports of Contact, attempting to build a case against Webster for being a threat
to women at the VA. PO Jordan stated that she did not have any problems with PO
Webster and that she had hardly even seen PO Webster since he returned to duty status.

101. October 30, 2009: At approximately 1100 hours, PO Webster was walking
out of Building T-1 and met up with PO Beard, who was smoking a cigarette.

    a. PO Beard advised PO Webster that he was writing the annual evaluations and
that the was not going to write them like PO Ruble had done as all standards, because PO
Ruble did not want to write anything else in the evaluation areas.
    b. PO Beard advised PO Webster that he was rating him as excellent in areas of the
evaluation.
    c. PO Webster advised PO Beard that he had submitted a promotional package to
Human Resources for the Lead Police Office position again.
    d. PO Beard advised PO Webster that it was time someone stepped up, as they
were at the bottom of the barrel for people to promote in the VA Police at Salt Lake City.

102. October 31, 2009: At approximately 1830 hours PO Webster was working
overtime with PO Tressa Jordan.

    a. PO Jordan stated that Officer Gary Steffen had been living at Chief Bell's house
during a separation from his wife and she did not know if he was still living there.
    b. PO Jordan stated that Chief Bell had directed her not to talk to PO Ronda
Harper in the VA Police department. That they communicated on their cell phones and by
email instead.
    c. PO Jordan stated that back in July, 2009, PO Harper had told her that she was
having a lot of problems with Officer Gary Steffen disappearing for hours at a time and

having lunch with Chief Bell and PO Beard.

d. That is when PO Harper had asked Officer Steffen one time where he had been, Officer Steffen stated that Chief Bell had written a Report of Contact for him and had Officer Steffen come back over and signed it for him. This was July 19, 2009.

e. PO Jordan stated that PO Beard had stated that when he had applied for the position of Supervisory Police Officer in March of 2009, he had to change his references on his resume and KSA's so that it did not show that he had worked for Chief Bell when they were both on active duty at Hill A.F.B.

f. PO Jordan stated that PO Beard told her that it would not look right if Chief Bell had been his supervisor at Hill A.F.B and then promoted him to Supervisory Police Officer after Bell became the Chief of Police at the VA.

g. PO Jordan stated to PO Webster that it was not right that Officer Vouvalis was promoted over PO Webster to Supervisory Police Officer and that Vouvalis had only wanted the letter from Human Resources stating that he was eligible for promotion and that he had originally turned down the position.

h. PO Jordan stated that PO Beard and Chief Bell had called Officer Vouvalis over and brow beat him into taking the position, so that they did not have to promote PO Webster.

i. PO Jordan stated that when she found out that there were three other applicants, she pulled her application so that PO Webster would get the promotion. PO Jordan told Webster that she was harassed about pulling her application.

103. November 3, 2009: PO Webster received written verification from the Salt

Lake City Human Resources Office that Webster's application for Vacancy

Announcement number **D2069-2010** had been received. This vacancy is the subject of PO

Webster's Claim C, Event 13.

104. November 6, 2009: PO Webster received written notification from Lisa

Porter, Human Resource Director for Vacancy Announcement number D2069-2010 Lead

Police Officer, GS-0083-8.

a. The written notification stated, "Your application was carefully considered, along with those of other interested candidates, for the position in which you had indicated and interest.

b. "This vacancy announcement had been cancelled."

105. November 9, 2009: PO Webster's Settlement of his OSC whistle blower complaint was finalized. VA was required to fix all Webster's records to remove all adverse information therein, to pay attorney's fees, backpay, sick leave, annual leave, and loss of pay. Attorney Mitch Tolman was involved in this case.

106. November 09, 2009: Chief Bell signed as the approving official on PO Webster's Annual Performance Appraisal Report, which was completed by PO Beard.

a. In Section C –Actual Achievement, PO Webster was rated exceptional in three of the five rated elements, Law Enforcement, Training and Administrative Responsibilities.

b. **Law Enforcement:** PO Webster demonstrates an exceptional degree of personal and professional control when dealing with persons who are hostile, uncooperative and unreceptive and whose opinion often differs from established policies and/or regulation. Office Webster demonstrated exceptional communications skills while responding to a disturbance ensuring only the minimum amount of force necessary is utilized to restore order.

c. **Training:** PO Webster has demonstrated an exceptional ability to keep up with training requirements and deadlines as well as striving for additional outside law enforcement training through the Utah POST Academy. PO Webster selflessly volunteered to attend the Post Standards Field Sobriety Test Course, Field Training Officer Course, POST Supervisor and Leadership Course, Employee Discipline and Administrative Procedures Course and successfully obtained Utah State POST certifications in all the courses.

d. **Administrative Responsibilities:** PO Webster demonstrated an exceptional ability to articulate in writing when completing Police Uniform Offense Reports and

Daily Operations Journal entries. PO Webster researched a CCT registered business that sold personal gun lockers that were over $5,000.00 less that most gun lockers on the market. Arranged the acquisition and coordinated delivery and installation. His actions saved Police Service cost.

107. November 13, 2009: Chief Bell posted a Monthly Alarm Check Assignment

sheet on the bulletin board in VA Police Operations. The Assignment sheet did not list

PO Webster for any checks throughout the entire FY10 year.  This shows that PO

Webster was not expected to continue working there.

a. Ryan Zumwalt provided PO Webster with a Notarized Affidavit   consisting of nine pages detailing threats, discriminations, harassment and retaliation towards PO Webster by Veterans Affairs management and Chief Bell.
b. Among other things, it stated:
c. Over the course of the last 6 years, I have gained knowledge that Chief Cowley, Lieutenant Ruble, Robin Korogi and others have hatred for Dana Webster because he would not ignore violations of law, always did what was right, even when they did not agree with his course of actions they harassed him when he did what was right.
        . . . .
d. I personally witnessed and was told that during Dana Webster's military leave for operation Iraqi Freedom, Chief Cowley constantly told the entire department that he was going to fire Dana Webster when he returned from military leave and Chief Cowley even hired his replacements but labeled them temporary.
        . . . .
e. During Webster's military leave, Chief Cowley continually would state he was going to "Can Webster's ass when he returns."
        . . . .
f. On November 2, 2006 in an email, Chief Cowley stated to me "Webster would be resigning on Monday November 15, 2006."
g. Then when I returned to work from my days off, I observed Webster working, so I asked Chief Cowley why he did not resign and Chief Cowley stated, "I could not get him to resign so Korogi and I will have to come up with something else."

. . . .

h. I have seen paperwork where Chief Cowley and Robin Korogi were preparing to terminate Dana Webster for investigating a case of child pornography they wanted to handle administratively and they wanted to terminate him because of complaints he filed about he case and the agencies (sic) actions.

. . . .

i. I have also seen a signed letter by Chief Cowley when he was an officer in the department where he threatens to do serious or bodily harm to Dana Webster by stating that he wanted to choke him . . .

j. The former associate director and Korogi were provided a copy of this letter from Cowley threatening to choke Webster and asked to take appropriate action on it and the other complaints.

. . . .

k. On another occasion, I watched as Ruble placed a picture of a cartoon character named dark wing duck on the office bulletin board and wrote on it "Webster the web footed crime fighter" for all officers to see and laugh at Webster's expense while he was on leave.

l. Another time within the last 2 years I observed that on Dana Webster's days off his assigned locker was vandalized by another officer by writing officer anonymous on it in permanent marker on it so others could see, laugh and join in on the harassment towards Webster because he was always referred to as "Mr. Anonymous complaint."

m. The Chief, Robin Korogi, and the Union and others allowed this officer to do this and when this occurred, this officer was promoted over Dana Webster I believe so the agency could reward him for harassing Webster because they blame him for all the anonymous complaints about the department.

n. In December 2007 I was contacted at my home and asked by Jim Ruble if I wanted to make any official statements against Webster for him, the Chief and Robin Korogi to use, he was seeking information on if I think Webster is unfit for duty, mentally ill, does not do his job and more.

o. Ruble then proceeded to tell me that he feels that Webster is a danger to the other officers, that he files frivolous complaints and that they believe Webster needs to be removed from the department and we will not have any more problems with complaints if he is gone.

. . . .

p. Most recently we received a new Chief of Police named Albert Bell . . . below is

noted of my interactions with him that are taken from notes made of the meetings with him.

     . . . .

q. [On March 19, 2009 Bell] stated that when making a selection [for promotions] it involved the Union, HR, the Director Korogi and that all those people were involved but he made the decision ultimately.

     . . . .

r. [Bell] states, "I am telling because you brought up Dan, innocent in my eyes but he made my road very course to travel on" . . .

     . . . .

s. I have also watched over the last 7 days since Chief Bell was notified he has to be interviewed for an OSC investigation that he has begun building a retaliatory case against Webster because he is mad at him for involving him in these matters and it all started when Bell was notified he had to be interviewed.

108. November 17, 2009: Salt Lake City VA Police Call Sign sheet listed PO Webster as the senior police officer in seniority.

109. November 18, 2009: PO Webster was awarded the Mid-Management Certificate from the Utah State Peace Officers Standards of Training.

110. November 20, 2009: PO Beard conducted a Fact Finding Investigation on PO Tressa Jordan in reference to Officer Gary Steffen and the allegations that he had been staying at Chief Bell's residence, and regarding her use of Native American terminology.

111. November 23, 2009: PO Beard sent an email to all VA Police Officers for the copy of slides from the FY10 1st quarter Staff Meeting.

a. PO Webster was not assigned any additional duties.

112. December 1, 2009: At approximately 2000 hours, PO Benincosa advised PO

Webster that prior to him leaving for the Tactical Firearms Instructor Course he

overheard a conversation involving Chief Bell and an unknown person detailing how the

Facility Director had authorized an un-named person to conduct a full investigation on

Officer Webster.

a. Officer Benincosa advised PO Webster that PO Beard had stated that they were not going to fill the vacant lead position until after the first of the year.
b. Officer Benincosa stated that PO Vouvalis has a clause in his promotional agreement, that he could step down and become an officer again.
c. Officer Benincosa repeated what he had stated at a prior F.O.P meeting, that Chief Bell has openly stated that the rating system did not matter and that he decided who he wanted to be promoted.
d. Officer Benincosa stated the Chief Bell had ordered him to write Report of Contacts on Officer Zumwalt and directed him what to say and what he wanted in the report of Contact.

113. December 2, 2009: Program Support Specialist Ryan Ahern sent an email to

all VA police officers with the subject heading of: New Captain and concerning Vacancy

**2010-2010** above.

a. By a unanimous panel decision, PO Beard has been selected as the  new Captain, effective today.

114. December 3, 2009: At approximately 0300 hours, Chief Bell arrived at the

VA police Operations Center and advised PO Webster that another VA Police officer

during a Fact Finding Investigation, stated that there was a drive in the department to

-49-

stand up to Bell and that PO Webster was identified as the leader of the drive.

a. Chief Bell advised PO Webster that PO Beard and PO Vouvalis were going to be conducting Fact Findings on PO Webster in the next couple of weeks.

b. Chief Bell stated that he did not know what they were about, but that PO Webster should be okay.

c. Chief Bell advised PO Webster that he was trying to keep information out of PO Webster's OPM File and that there was an Administrative moratorium on Disciplinary Actions from December 13 through January1st and that PO Webster should consider taking leave before then. Webster could tell by Bell's tone of voice and attitude that he was being disingenuous, and was saying these things to manipulate him into making admissions. Webster did not fall for this.

115. December 4, 2009: At approx: 1200 hours, PO Webster picked up a

government van for transport of VA Police Officers to the Murray Police Department

Firing Range. PO Webster detected the smell of alcohol on the breath of Officer Gary

Steffen and notified PO Fisher who had also noticed the smell of alcohol. Officer Steffen

was removed from duty and driven home by PO Vouvalis.

a. PO Webster completed a Report of Contact and was listed a witness in Uniform Offense Report 2009-12-04-1330-3534 with Officer Steffen as the suspect.

b. PO Webster received written verification for submitting an application for Vacancy Announcement # **D2131-2010**.

c. It said: "Thank you for your response to our current job opening and for your interest in VA Salt Lake City Health Care System."

116. December 28, 2009: PO Beard sent an email out with the subject heading of:

"Congratulate the New Sergeant," concerning Vacancy # **D2069-2010** .

a. Please take time to congratulate Officer Harold Hess who had been selected for

-50-

the recent Sergeant promotion.

b. Officer Hess had an Entry on Duty Date of 4/27/2009 and was still on probation.

c. Chief Bell was the selecting official who promoted Hess for Vacancy Announcement number Vacancy # # D2069-2010. Chief Bell had selected Officers Vouvalis, Beard and Stitikus who sat on the selecting board or panel. At the time he was promoted to this position, Harold Hess was approximately in his late 30s in years of age and had less experience than PO Webster because he had only 5-6 months as a VA Police officer. At the time, PO Webster was 54 years of age and had the qualifications as noted above that Mr. Hess did not have.

d. PO Stitikus admitted that, "it was chief Al Bell," that gave the board instructions on how the panel would operate and that no job qualifications were reviewed in considering who would be selected.

e. Regarding this incident, PO Benincosa wrote a statement that includes the following:

i. The same exact thing happened when Webster tried to apply for Sergeant . . . another Officer (Hess) who had not even been here a year and still on probation was selected over PO Webster who is a seasoned veteran officer. The same thing happened again with us or vice versa with the Lieutenant opening.

117. December 31, 2009: PO Webster received written notification from Lisa

Porter Human Resources Director for Vacancy Announcement # **D2069-2010**-Lead

Police Officer.

a. "You were qualified and referred for consideration but not selected at this time."

118. December 24, 2009:  PO Webster was not selected for the position of

Supervisory Police Officer.  PO Webster was not interviewed for the position. Mike

Knowles was selected.

a. Chief Bell was the selecting official who promoted Mike Knowles for Vacancy

Announcement number **D2131-2010**. Officers Vouvalis, Beard and Stacy Parsons sat on the selecting board.

    b. At the time he was promoted to this position, Mike Knowles was approximately in his mid-to-late 40s and had less experience than PO Webster because he had no experience as a VA police officer. At the time, PO Webster was 54 years of age and had the qualifications as noted above that Knowles did not have.

    c. Even though it was required by protocol, PO Webster was not interviewed for this position.

    119. December 31, 2009: PO Webster was passed over for position of Lead Police Officer and PO Hess was given the position as stated above.

    120. January 31, 2010: Robin Korogi left as the Associate Director and Acting Director of the SLC VAMC.

    121. February 2010: Val Martin, Chief Financial Management Officer, replaced Albert Bell as the Acting Chief of Police of the SLC VAMC. Upon assuming his duties, he informed PO Jordan that if she, "didn't drop [her] complaint and get on board," and forgive Al Bell, Ron Beard, Mike Morse and Wayne Vouvalis, he would get rid of her.

    122. March 2, 2010: Albert Bell resigns while under investigation for Hostile Work Environment, threatening employees, sexual harassment and other inappropriate behavior. Dir. Korogi indicates that Chief Bell was informed that if he didn't resign he was going to be terminated.

    a. Besides PO Webster complaining about Chief Bell, Dir. Korogi knew of two other individuals who had complained about Chief Bell screaming and yelling at the

Director of Computer Services because Chief Bell wanted the government to pay for business cards he had purchased from a private vendor and for disregarding advice by the human resource division that he could not take disciplinary action because he didn't have the evidence needed to sustain the action.

    b. PO Jordan testified that Chief Bell was "very aggressive," and that, "he didn't believe that women should be in the police department."

    c. PO Jordan also described an event in which Chief Bell waited until her shifted ended and she was disarming in the armory where there were no security cameras. He ordered her to lock the armory door, then ordered her to write a statement against a VA employee named Todd Hanson because Chief Bell apparently had a conflict with them. At some point, during this altercation, Chief Bell retrieved his personal weapon from his locker and started counting bullets. PO Jordan refused to write a statement and Chief Bell became angry and started yelling at her and backed her against a locker to "within inches," of her face. She stated that Chief Bell, "thinks he's a very smooth talker and manipulator and he can convince you of what he wants put on paper. He will say: 'you know this happened, you saw this happen,' when you know it didn't, but he tries to smooth talk his way into getting what he wants." She testified he had done the same thing in regards to PO Webster when he sent PO Beard to coerce her into giving a statement against PO Webster. She became frightened and tearful and asked him to unlock the door. He did and she immediately left and quickly went home. While she was leaving, Chief Bell positioned himself where she had to pass him on her way out. She indicates that, "he stopped me again, and told me he was very disappointed in me . . ."

    d. PO Jordan further indicated that Chief Bell would, "get angry in operations, throw things, write derogatory statements on the brief board . . . ," and would "throw temper tantrums," by pacing back and forth, getting loud and ranting.

    e. PO Jordan also testified that although she had seniority over other male officers she could not get a better shift or her weekends off over younger males with less seniority recruited by Chief Bell.

    f. PO Jordan testified that she was sexually harassed by PO Dan Pinchbeck that she tried complaining through the chain of command by complaining first to PO Pinchbeck himself and then to PO Beard, however nothing was done. Officer Pinchbeck had been recruited by Chief Bell and was Chief Bell's friend. Because nothing was done, in December 2009, she then made a formal AIB complaint through HR. Within 10 minutes of making the complaint, she was called by PO Beard and indicated that a fact-finding investigation was being conducted against her.

g. She further indicated that Chief Bell incorporated himself into every committee designed to address protected activity complaints. This troubled her because she knew, by her experiences, that he would take disciplinary action against them.

123. August 15, 2010: Steven E. Anderson wrote a statement that he emailed to

investigator James Itamura. This statement includes the following:

a. . . . I was a witness as well as a victim to the numerous unfair, underhanded, and malicious things done to employees in one department than I have ever known to happen in all my professional career as a Police Officer and Government Employee. PO Webster is the focus at this time and there is enough for me to say just in (sic) his behalf alone to show that any reasonable and prudent person could see there was unfair and unlawful mishandling of PO Webster . . . job descriptions [were] altered to allow such applicants to fill positions as supervisors that did not possess the ability to function in those areas . . . The latest fiasco was due to a very strong, clear and in-our-face Air Force dominated Connection involving an Officer that was in our department that was greasing the wheels for a former Air Force supervisor we had.

b. The director at this time was also a former Air Force retired product (Robin Korogi) who has also left this facility along with the Chief of Police that was hired under her watch . . . The next Chief to be hired was Albert Bell ...

c. . . . Now I saw and Heard (sic) Mr. Bell make statements about officers here that he could not back up when he would just say "I am going to make so and so a Sergeant, Lieutenant or a Captain." . . . There were Promotions to be filled and the People that filled them were virtually handpicked and most of us knew before the positions were even posted who would fill them . . . PO Webster and Officer Tom Tudor of this department we (sic) overlooked for these spots even though Officer Tudor was a retired Layton City Police Officer and had at least 10 years experience here at our facility. PO Webster's experience was not as great but compared to the Air Force Officers that were selected he had four years experience just being an Officer here. We have a policy in the V.A. that states no one can move up two grades in a year unless a supervisor puts them in for that kind of a jump and it is very, very rare. But here we had two Officers make rank over all the rest and the two of them put together only and Five years on as an Officer here but again made it on here with no real Police experience other than the Security work at Hill Field. One went from a Police Officer to Sergeant, then to Lieutenant a short time after

-54-

that and then to Captain all under three years. The last two promotions were given to him by his friend from Hill Field, Chief Bell.

d. The Officer that is just a kid was only here for a year and skipped right over Sergeant and was made a Lieutenant. He turned it down first but was then brought in and told that the Chief told him if he didn't take it he would surely then Have to promote PO Webster who by the way had put in for every promotions that had been filled by these men but had not even been given an interview . . . But this is what [Bell] constantly did . . . telling others that they would be fired or telling my Sergeant, Sergeant Fisher, that if he did not go after PO Webster and me and make it so we could be fired that he may lose his job as well. On one occasion Segeant fisher (sic) and I were taken in to the Chiefs (sic) office and told that we were to write reports of contact on PO Webster . . . I was told that we had to write that PO Webster had committed a work force violence incident just because he said something about the Chiefs (sic) new radio designators for us (Oscar) two weeks prior that everyone in the office had teased to some extent. At a later date, just prior to us getting told to write this report, the Chief was in a staff meeting where he berated us all telling us how infantile we were for say (sic) anything about his new radio designators and yet here he was wanting us to write PO Webster up for this same infantile behavior after this speech was made . . . This made it very clear that this Chief was out to get PO Webster and as many of the older Officers that were hold over's (sic) from when he started his hiring spree of all Hill Field Air Men. After this incident PO Webster was told to get ready to go to Little Rock to be trained as a weapons instructor. PO Webster made his plans, and a week prior to his departure was told to cancel his plans as there was no money in the Police budget to send him at this time. A week later another Officer was on his way to be the Weapons instructor. So there was money for him, but not PO Webster.

124. August 23-26, 2010: Emails were exchanged between Anthony Auriemma and James Itamura as follows:

a. Itamura email to Auriemma: "Do you recall hearing former chief Bell syaing (sic) something to the effect that he wanted all the older officers out of the office and to replace them with new hires from security forces at Hill AFB?

b. Auriemma to Itamura: "I remember hearing Bell say something to that effect, but I can't recall the exact wording."

. . . .

c. "Bell did say, he was told to clean house and to use whatever means available . . . He did know just about all the new hires, by working with them in the Air Force or TW a contracted company at Hill Air Force Base. Around 10 of the new hires."

125. Complainant is 54 years old (DOB February 1956).  All persons selected and promoted over PO Webster were younger and less experienced.

126. On September 9, 2009, the Agency submitted an agreement regarding Webster's prior OSC complaint. The agreement was completely executed on November 9, 2009.

The agreement stated:

a. In consideration for the mutual promises and assurances. Herein, the Parties, Dana Webster ("Employee") and the U.S. Department of Veterans Affairs ("VA") hereby agree to settle and resolve all claims, disputes and causes of action raised in Office of Special Counsel ("OSC") complaint number MA-08-0937 . . .
. . . .
b. Employee agrees to:
c. Withdraw his complaint, MA-08-0937, to the Office of Special Counsel (OSC) by his signature below.
d. Waive any and all rights he may have in any forum to contest or challenge any action identified in paragraph 1a. that was the subject of MA-08-0937 . . . Employee agrees not to initiate in any forum any further legal action against the VA, its agents, employees, or former employees, for any actions that were the subject of his OSC complaint.

127. This agreement only resolved, "all claims, disputes and causes of action raised in Office of Special Counsel ("OSC") complaint number MA-08-0937," the

subject of Webster's MA-08-0937 action. It did not resolve any other issues that have

arisen during the investigation of the claims made in MA-08-0937, nor that have arisen at

any time thereafter.

128. The agreement also stated that the VA agreed to:

Rescind and remove all negative references from Employee's Official
Personnel File (OPF), supervisory files, and any other agency records regarding
the following identified actions: [Summarized letter of admonishment, counseling,
detailed to radiology department, ordered to undergo psychiatric fitness of duty
examination, decision imposing three-day suspension, additional counseling,
placement on administrative leave and all documents related thereto–spanning the
dates October 30, 2007 through June 7, 2009].

This clean-record provision includes, but is not limited to, the removal of all
references to allegations or complaints, oral or written counseling, warnings or
admonishments, letters of reprimand and suspensions regarding the above-listed
actions.

129. It is therefore also indisputably clear that the Agency is obligated to comply

with that agreement, and they cannot use any of the adverse information that was

expunged from PO Webster's OPF.

130. As noted above, PO Webster, during the times in question, engaged in the

protected activities of making several FOIA requests, complaining about his treatment by

Chief Bell or others, complaining about being passed over for promotions, participating

as a witness in Zumwalt's EEOC complaint, and gathering information to contest the

adverse actions that had been taken against him.

**Cause of Action–Age Discrimination, Retaliation and Hostile Work Environment**

131. PO Webster did suffer from adverse action. Webster submits that the actions taken —in placing him on leave; suspending him from his duties as a police officer; subjecting him to disciplinary actions for de minimis and frivolous reasons preventing him from receiving firearms training; passing him over for promotions; and constantly threatening him with adverse action for engaging in protected activities—sufficiently establish that these were adverse actions taken against him and he was subjected to a Hostile Work Environment–18- 18c, 20, 22a, 27, 39, 42- 43, 63- 64b, 65a, 66b, 69, 78- 78d, 81d- 81h, 94, 95- 95b, and 104c.] These adverse actions were sufficiently close to PO Webster's protected activities that the proximity in time leads to the conclusion that there was a causal connection between the two.

132. Furthermore, the evidence indicates that all those involved with the adverse actions taken against PO Webster were motivated by his protected activities to take such adverse action.

133. First, the facts in this case show that Chief Bell, Dir. Korogi, and PO Beard ensured that everyone at the SLC VA, and in fact everyone in the entire VA, were aware that PO Webster was not to be promoted. Furthermore, to ensure this, Chief Bell appointed promotion boards, was the selecting official for promotions, instructed board

members what they were to do, and again made sure that everyone knew that PO Webster was not to be promoted. The selection process that occurred was just a formality. Chief Bell and PO Beard specifically told many police officers that they were getting rid of PO Webster.

134. Second, PO Webster was often left off of duty details indicating that the VA in fact did intend to terminate him.

135. Third, the VA acknowledged and was aware that its actions against PO Webster were unfounded.

136. Lastly, not only were PO Webster's qualifications, experience and education superior to that of other persons that were promoted, allowed training and given positions of leadership, the Agency's agents acknowledged that the only reason adverse action was taken against PO Webster was because of his protected activities. Also, evidence indicates that the Agency treated PO Webster differently.

137. The evidence therefore demonstrates both by direct and circumstantial evidence that the Agency, through its agents Chief Cowley, Dir. Korogi, Chief Bell, PO Beard and others, took adverse action against PO Webster because they wanted to prevent him from engaging in protected activities. The reason they wanted to do so is because they were in fact engaging in inappropriate conduct.

138. Along with his retaliation claims, PO Webster can state a case of failure to promote because: (1) PO Webster was a member of a protected class; (2) PO Webster applied and was "qualified" for numerous positions, training and leadership opportunities; (3) PO Webster was rejected; and (4) the positions were filled by persons younger than PO Webster.

139. The Agency may intimate that because some persons promoted and granted training and leadership opportunities over Claimant were over 40 that therefore he cannot prove discrimination. In other words, it may intimate that because some of the similarly situated VA employees, i.e., over the age of 40, are, "members of the same protected class," their promotions and opportunities for training and leadership over PO Webster fail to establish discrimination. The Agency does argue that Claimant must prove that in all circumstances involving all promotions, hirings, terminations, and the granting of training and leadership opportunities that these were done in a discriminatory manner, or show a pattern of discrimination. This is not the law.

140. In, *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308,  355 L.Ed.2d 433 (1996), the Supreme Court unanimously rejected the notion that an age-discrimination plaintiff must prove, as part of his prima facie case, that he was replaced by someone outside of the protected class (i.e., persons under the age of 40).  The court

reasoned:  As the very name prima facie case suggests, there must be at least a logical

connection between each element of the prima facie case and the illegal discrimination

for which it establishes a legally mandatory, rebuttable presumption, [*Burdine*, 450 U.S.

at 254 n.7]. The element of replacement by someone under 40 fails this requirement . . .

The fact that one person in the protected class has lost out to another person in the

protected class is thus irrelevant, so long as he has lost out because of his age. *Id*. at 311-

12.

      141. Hence, while the general rule is that, "In order to make out a prima facie case

of discriminatory termination, a plaintiff must ordinarily show that the position ultimately

was filled by someone not a member of the protected class," *Brown v. McLean*, 159 F.3d

898, 905 (4th Cir. 1998) cert. denied, 526 U.S. 1099 (1999), as has also been stated by the

10th Circuit Court, in, *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002), the D.C.

Circuit stated that, "Nearly every Court of Appeals to consider the issue, both before and

after *O'Connor*, has agreed that the fact that an employer replaces a plaintiff with a

person from within the same protected class is not, by itself, grounds for dismissing a

Title VII claim. See *Perry v. Woodward*, 199 F.3d 1126, 1136-41 (10th Cir. 1999), cert.

denied, 529 U.S. 1110 (2000).

      142. Moreover in, *Pitre v. W. Elec. Co.,* 843 F.2d 1262, 1268-70, 1272-73 (10th

Cir.1988) the Court stated the following:

> A sex discrimination claim [or age discrimination claim] does not fail
> simply because an employer does not discriminate against every member of
> the plaintiff's sex [or age group] . . . [T]he fact that similarly situated males
> were treated just as poorly as a female plaintiff, or the fact that other
> women were treated more favorably than the plaintiff, does not necessarily
> "preclude the district court from finding a statutory violation."
> . . . .
> [A]n employer is not immunized from liability simply because some males
> received detriments before or contemporaneously with a Title VII plaintiff.
> . . .
> Such evidence [of sex discrimination] was plentiful in *Pitre,* where the class
> plaintiffs offered statistical evidence that women suffered a
> disproportionate number of downgrades within the defendant-company;
> statistical evidence of a clustering of women at lower-paying salary grades;
> evidence that management personnel who made promotion and demotion
> decisions held discriminatory attitudes towards women; evidence that the
> management personnel acted upon those attitudes through beneficial
> treatment for men in promotion and demotion decisions and through
> harassment of women; and testimony from several women regarding
> instances of sexual harassment.

143.  In conclusion, while the ADEA defines the protected class as those over 40, it

does not state that to show age discrimination, those within the protected class can only

prevail by making comparisons to those outside of the protected class.  While this type of

comparison is more weighty as to some protected classes, such as gender and race, it is

not as to age.  If this were true then, the Agency and other employers could, with

impunity, decide that while they were okay with employees younger than, let us say 55,

they were going to bar employees over age 55 from promotions and raises and then

terminate them at age 60.

144. Moreover, subclasses within protected classes (darker skinned vs. lighter

skinned African American) are protected from discrimination as are classes such as

"gender plus" groups.  In, *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d

1025 (5th Cir. 1980) the court held that disparate treatment of a subclass of women (or

men) can constitute a violation of Title VII.  This is the sex-plus doctrine and would apply

to classifications that link gender with all sorts of immutable physical characteristics, such

as minimum weight (175 lbs.), minimum shoulder width, minimum biceps measurement,

minimum lifting capacity (100 lbs.), and the like.  This would also include familial

circumstances incidental to sex, like policies that classify female employees differently

who have children, who have young children, are pregnant, are single and pregnant, are

single, and who are married.  Furthermore, this would include distinctions based on some

fundamental right or upon immutable characteristics that are protected such as race,

national origin, color, age, disability and religion.  The only significant group of cases to

reject the "sex plus" theory of discrimination are cases in which plaintiffs have claimed

that hair length regulations for men constitute "sex plus" discrimination.  In *Jefferies*, the

court went on to state: "It is clear from the foregoing cases that an employer may not

single out black women for discriminatory treatment." Similarly, it should be clear an employer may not single out older women for discriminatory treatment.

145. Applying this same doctrine to age discrimination, the Agency cannot discriminate against age-plus classes. For instance, just as it would be discriminatory to have an agency-wide policy that preferred younger applicants over older applicants in any positions within the VA, it is just as discriminatory if, as in this case, the VA, either as an agency or through the actions of a single person, such as, Chief Bell, who simply wanted younger employees filling Sgt. and Ofc. roles, but was okay with older individuals filling upper management roles. This is still age discrimination and is prohibited under current federal law.

146. The Agency seems to argue that since older individuals filled some roles at the VA that Claimant's assertion that he was discriminated against because of his age is defeated. This is not the law.

147. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006). "**A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees**

**in determining whether they are similarly situated**." *Id.  Aramburu v. Boeing Co.*, 112

F.3d 1398, 1404 (10th Cir. 1997).

148. In, *Bennington v. Caterpiller Inc.* , 275 F.3d 654, 658, 660 (7th Cir. 2001) the

court stated:

> Generally, when both the plaintiff and those allegedly favored over him are
> within the same protected class, "the prima facie case under the ADEA
> require[s] a sufficient disparity in ages." This court "consider[s] a ten year
> difference in ages (between the plaintiff and [his] replacement) to be
> presumptively 'substantial.'" *Id*. at 893. In *Hartley*, this court concluded
> that a seven-year difference between the plaintiff and the employees
> allegedly favored over her was not significant enough to present a prima
> facie case under the ADEA. Just as in *Hartley*, the five-year difference in
> age between both Bennington and Lubbers is not substantial enough (in and
> of itself) to set forth a prima facie age discrimination case.
> . . .
> In cases where the age difference between the plaintiff and the individual
> treated more favorably is less than ten years, "the plaintiff still may present
> a triable claim if [he] directs the court to evidence that [his] employer
> considered [his] age to be significant." (Citations omitted).

149. In conclusion, PO Webster's testimony sets forth sufficient detail to

demonstrate that he was similarly situated with other officers yet, because of his age and

because of his prior protected activities, he was blacklisted by the management and

thereby excluded from promotions, training opportunities, and leadership positions.

150. In this case, given that the Agency has admitted that they engaged in improper

actions against PO Webster, and that there were no other reasons to justify failing to promote him, the agency has not shown any valid reason for its adverse action. Moreover, the parties' previous settlement bars the Agency from using any of the adverse information that it claims applies to PO Webster. Even if it has, PO Webster can show that its justifications for its adverse actions are pretextual.

**151. Pretext:**  To show pretext, Webster "must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons," or that DWS's stated reasons are "disingenuous" or a "sham." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998), "  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).

152. PO Webster's evidence demonstrates that Chief Bell manufactured evidence against PO Webster in order to take adverse action against him. Through intimidation and outright fraud, Chief Bell submitted reports of contact purporting to be from other police officers that he in fact had drafted and made them sign.

153. PO Webster has also demonstrated that Chief Bell directly stated that he wanted to eliminate the older officers at the SLC VA and that he also wanted to promote

younger friends from Hill Air Force Base.

154. Lastly, as noted above, when PO Webster's qualifications, experience and education are compared to that of the younger officers that were promoted over him and when this is compared to the manipulative behaviors engaged in by the Agency through its agents, the ALJ can conclude that the Agency's justifications for its agents are implausible, contradictory and inconsistent and cannot be believed. On the contrary, the overwhelming evidence is that the Agency through its agents retaliated and discriminated against PO Webster because of his age and because of his engagement in protected activities. It has a pattern of behavior which is inconsistent with current law.

Wherefore, Plaintiff requests that a jury be called to hear this matter and that he be awarded:

1. Lost wages both past, present and future lost wages and lost pension benefits in a sum not less than $3 million or as will be shown in trial;

2. General damages in the sum not less than $300,000;

3. Consequential and incidental damages in the sum not less than $50,000;

4. All attorneys fees and costs,

5. All other damages that the law allows or that are deemed equitable and just.

DATED this 6 day of February, 2013.

ARROW LEGAL SOLUTIONS GROUP, PC


/s/Loren M. Lambert
Loren M. Lambert
Attorney for Plaintiff